1
2
3
4
5
6
7
8                    **IN THE UNITED STATES DISTRICT COURT**

9                    **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   WARREN HERMAN SLOAN,                          No.  2:19-cv-02508-KJM-DMC-P

12                    Petitioner,
                                                   <u>FINDINGS AND RECOMMENDATIONS</u>
13          v.

14   JEFF LYNCH,[1]

15                    Respondent.

16

17          Petitioner, a state prisoner proceeding pro se and in forma pauperis, brings this

18   petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Pending before this Court are

19   Petitioner's amended petition for a writ of habeas corpus, ECF No. 13, and Respondent's answer

20   to show cause and lodged state court record, ECF Nos. 20, 22.  Petitioner did not file a traverse.

21          Petitioner asserts two claims: (1) the trial court erred when it denied his mistrial

22   motion; and (2) the trial court erred in admitting certain evidence during the direct examination of

23   Petitioner's common law wife Shannon Parks.  The last well-reasoned state court decision on the

24   matter is from the California Court of Appeal.  Having reviewed the petition and the record, this

25   Court recommends that Petitioner's petition be denied.

26   / / /

27          ───────────────────────
            [1]      Jeff Lynch, Warden at California State Prison, Sacramento, is hereby substituted
28   as the Respondent in this action pursuant to Rule 2(a) of the Rules Governing Section 2254
     Cases.

                                                    1

1

# I. BACKGROUND

2

**A.** **<u>Facts</u>**[2]

3
4
5
6

After independently reviewing the record, this Court finds the state appellate court's summary accurate and adopts it herein.  In its unpublished memorandum and opinion affirming Petitioner's judgment of conviction on direct appeal, the California Court of Appeal provided the following factual summary:

7
8
9

> An information charged Sloan with first degree murder (§§ 187, subd. (a), 189) with use of a deadly weapon, a knife (§ 12022, subd. (b)(1)). The information alleged he had a prior strike conviction (§§ 667, subds. (b)-(i), 1170.12) and had served a prior prison term (§ 667.5, subd. (b)).

10

> * * *

11
12
13
14
15
16
17
18
19
20
21
22

> In November 2010, Cheynah Watson, then 18 years old, moved from Oregon to Fairfield to live with her grandmother. In December 2011, Watson's grandmother, concerned that she had fallen in with a bad crowd and was breaking house rules, put Watson on a bus back to Oregon.
> On the morning of March 31, 2012, Watson's body was found in the backyard of a vacant house at 832 4th Street in Fairfield. She had been stabbed to death.
> On the night of March 30-31, 2012, Michelle Shields was staying with her friend Emanuel Stewart at his home at 1701 Idaho Street, which is next to the house at 832 4th Street. Shields had known the defendant, Sloan, for over 20 years, since they attended junior high school together. Shields testified that another house in the neighborhood, at 1609 West Kentucky Street, had numerous residents and was known as a house where people frequently used illegal drugs. She believed the house was used for "high drug trafficking .... Drugs, cars, illegal activity ... mainly prostitution."
> At around 3:30 or 4:00 a.m. on March 31, 2012, Shields went to the residence at 1609 West Kentucky to ask for a cigarette. She knocked at the front door, which led directly into Sebrina Robinson's room. Someone answered the door, and Shields asked to purchase a cigarette. Shields entered and saw Robinson, Willie Malcolm (Robinson's boyfriend), Sloan, Watson, and another man, Jedidiah Smith.

23

/ / /

24
25
26
27
28

---

[2]    Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct."  Findings of fact in the last reasoned state court decision are entitled to a presumption of correctness, rebuttable only by clear and convincing evidence.  <u>See</u> <u>Runningeagle v. Ryan</u>, 686 F.3d 758, 762 n.1 (9th Cir. 2012).  Petitioner bears the burden of rebutting this presumption by clear and convincing evidence.  <u>See</u> <u>id.</u>  As a result, the facts are taken from the opinion of the California Court of Appeal for the First Appellate District in <u>People v. Sloan</u>, No. A146660, 2018 WL 4877412 (Cal. App. Ct. Oct. 9, 2018), a complete copy of which Respondent lodged as ECF No. 22-1.  Petitioner may also be referred to as "defendant" in the restatement of facts.

After Robinson gave her a cigarette, Shields left and returned to Stewart's house. Stewart was asleep in his bedroom. Shields then went outside with Stewart's dog to smoke her cigarette. She went through the sliding glass door onto the back porch. The backyard was separated from the backyard of the residence at 824 4th Street by a fence about six feet high. The lighting in the backyard was "decent, but not adequate."

While she was smoking her cigarette, Shields heard a female voice coming over the fence from the yard of the residence at 824 4th Street. The woman was "cursing somewhat" as if she were under "duress." Shields testified, "I heard a female. It sounded to me like she was coming to or not aware or just confused.... I hear her say, 'What the fuck?' And then, 'Oh my God.' And then, 'What the fuck?' again. She never really finished a full sentence." The woman also said, " 'Oh my God. I can't believe.' "

The dog started "acting crazy" and went to the fence. Although Shields thought what was happening next door was "none of [her] business," she walked over to the dog, close to the fence. She "was right up next to the fence at that point when [she] was trying to get [the dog] to come in the house ...." Shields, who is 5 feet, 10 inches tall, looked over the fence and noticed a "figure step from the lighted area of next door into the darkness. I didn't know who it was at that point. But I knew there was someone who stepped from the light directly into the dark to where they couldn't be seen." The gate was open, and the streetlight shone partially into the backyard.

Shields grabbed for the dog, but she heard "rustling" and "[p]eeked" over the fence again, near where the garbage cans were kept. This time she was looking from a different angle and recognized Sloan. Shields said, " 'Warren Sloan, what are you doing?' " Sloan responded, " 'I don't know. Why don't you come find out?' " Shields stepped on a piece of wood or the garbage cans and climbed over the fence to the front yard of the residence at 832 4th Street. As she started to walk toward Sloan, she saw "two feet laying" on the ground; she could not see the rest of the body at that point. Shields again asked Sloan what he was doing, and he said he was "just taking out the trash." As Shields spoke to Sloan, she stayed in the lighted area of the front yard.

At some point Sloan was kneeling down and making a "pumping action" with his hands. Shields testified that she told the police she "thought the body was a blow-up doll" and Sloan was trying to blow it up. As Sloan made the pumping motion, Shields heard "air." It sounded as if someone was snoring. Shields could see the lower legs and feet of the body, and Sloan was closer to the head. Sloan said "it was taking too long."

When Sloan attempted to coax Shields into the backyard, she said, " 'No, I'm not going in there. Just whatever, Warren. Whatever you do, just close the gate when you're done.' " Sloan smiled and said, " 'Ha, ha. That's why I like you, Michelle. You're crazy.' " As Shields turned to walk away, Sloan said, " 'Oh, no, no, no. Hold on. I'm gonna give you something.' " He walked to her, said, " 'Here,' " and started to hand her something. She told him to wait and put her jacket over her hand to take the object. Sloan chuckled again and said, " 'Huh, yeah. That's why I like you, Michelle. 'Cuz you're crazy. Put this where nobody can find it.'" Sloan handed her a large "cooking" or "kitchen" knife.

/ / /

3

Shields took the knife, holding it with the sleeve of her jacket. She was scared. She "[t]urned around and got the heck out of there and walked down the street." She testified, "I knew it was an extreme situation. And I knew that if I was to be fearful or if he knew in any way that I was intimidated, that my life would be in danger." She did not see where Sloan went. Shields walked three or four houses down Idaho Street and put the knife in a garbage can in front of a residence. No one else was around. She dropped the knife into the garbage can and heard it fall to the bottom. She then walked back to Stewart's house. She climbed over the fence into Stewart's backyard and entered through the sliding door.

Stewart testified he was asleep in his bedroom on the night of March 30-31, 2012, and around 3:00 or 4:00 a.m., he heard a male voice and a female voice outside his window, which was closest to the residence at 832 4th Street. He could not hear what they were saying, but he thought the woman sounded "distraught." Shields came into the house shortly after that, and Stewart asked her about what he had heard, but she said nothing had happened.

After Watson's body was discovered in the yard of 832 4th Street on the morning of March 31, 2012, the police spoke to people in the neighborhood, including Shields. Shields initially told the police she had not seen or heard anything the night before. She also did not initially tell Stewart that she had seen or heard anything.

On April 1, 2012, the police again spoke to Shields at Stewart's house. A police detective told Shields that he had information that she had been at the West Kentucky Street residence on the night of the homicide, and he thought she might know something about the incident. The detective asked her, " 'Who killed Cheynah?' " Shields blurted out "Warren" and started to give a last name beginning with an "S," but she abruptly stopped and then "completely shut down." At that time, Stewart asked the detective to respect their wishes, to leave, and to have no further contact with them. The detective then left the house.

A few days after the homicide, after seeing Sloan at a friend's house, Shields returned to Stewart's house and told him what she had seen on March 31. Stewart testified that Shields said she was smoking in the backyard when she saw Sloan at the house next door. He was making a "stabbing motion" and it sounded like "he was blowing up an air pump, blowing up a tire for a bicycle." Shields walked over to where Sloan was standing, and he handed her a knife. She took the knife with the sleeve of her jacket, walked down the street, and put the knife in a garbage can a few houses away.

Stewart urged Shields to speak to the police, and she agreed. Stewart called the police and was told that he and Shields should come to the police station for an interview. Shields took with her the jacket she had been wearing on the night of the homicide.

Police detectives drove Shields and Stewart from the police station to Idaho Street in an unmarked car, and Shields pointed out the garbage bin where she had placed the knife that Sloan had given her. The police recovered a knife from the bin. The knife blade was about nine and one-half inches long and had apparent blood stains on it. The tip of the blade was broken.

Shields described herself at trial as "42 going on 5." She testified she was addicted to methamphetamine and alcohol. She had previously been prescribed medication for mental health issues. She testified that she was not under the influence when she saw Sloan in the backyard of the 832 4th Street house and that she was not taking prescription medications

4

at the time of the homicide. At some point prior to the homicide, Shields went into the vacant house at 824 4th Street and "rooted" around inside looking for anything valuable. She took clothes that she needed and items that were still in their packages, which she intended to take back to the store. She did not believe that she was committing burglary because the items had been abandoned and "didn't belong to anybody." Shields received immunity in connection with her preliminary hearing testimony, and she believed she might have immunity for her trial testimony.

The forensic pathologist who conducted the autopsy on Watson's body testified that Watson had 26 stab and incised wounds to her abdomen, chest, neck, face, scalp, back, buttocks, right arm, and right leg. She had suffered wounds to her liver, both lungs, trachea, carotid artery, colon, and left kidney. Several of the wounds would potentially have been fatal. The cause of death was multiple stab wounds. The stab wounds were consistent with the knife recovered from the garbage can on Idaho Street. There were no injuries to Watson's hands. There was no evidence of sexual assault.

DNA testing of three blood stains on the blade of the knife showed the profile of the major contributor matched the DNA profile of Watson, the victim. Testing of DNA taken from the handle of the knife showed the profile of the major contributor matched Sloan's DNA profile.

Several occupants of, and visitors to, the West Kentucky Street house testified (or previously told the police) that both Sloan and Watson were at the house on the night of March 30-31, 2012. One resident of the house, Willie Malcolm, told police that Sloan conversed with Watson and urged her to engage in prostitution, saying there was "money to be had on the streets" and telling her, " 'Let's go get it.' " On the morning of March 31, 2012, some of the residents of the West Kentucky Street house discovered Watson's body in the yard of the nearby 832 4th Street house, and one of them called the police.

ECF No. 22-1, pgs. 2-7.

**B.**     **Procedural History**

On June 12, 2015, a jury convicted Petitioner of first-degree murder with use of a deadly weapon. ECF No. 20-3 at 432-33. The trial court found as true Petitioner's prior strike conviction and that he had served a prior prison term. Id. at 450. The trial court sentenced Petitioner to serve 52 years to life in state prison. Id. at 475, 478.

Petitioner appealed his conviction, and the California Court of Appeal, First Appellate District, affirmed the judgment. ECF No. 22-1. Petitioner subsequently filed a petition for review before the California Supreme Court, which was summarily denied. See ECF No. 20-15. Petitioner did not file any state habeas petitions.

/ / /

/ / /

On December 17, 2019, Petitioner filed a federal habeas petition in this Court. ECF No. 1.  In April 2020, he filed a first amended petition.  ECF No. 13.  Respondent filed an answer, ECF No. 20, and later lodged complete copies of Exhibits 6 and 9 at the Court's direction, ECF No. 22.

## II.  STANDARDS OF REVIEW

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under § 2254(d)(1), federal habeas relief is available only where the state court's decision is "contrary to" or represents an "unreasonable application of" clearly established federal law.  Under both standards, "clearly established law" means the holdings of the United States Supreme Court at the time of the relevant state court decision.  See Carey v. Musladin, 549 U.S. 70, 74 (2006) (citing Williams v. Taylor, 529 U.S. 362, 412 (2000)); see also Plumlee v. Masto, 512 F.3d 1204, 1210 (9th Cir. 2008) (en banc) ("What matters are the holdings of the Supreme Court, not the holdings of lower federal courts.")  Unless Supreme Court precedent squarely

1  addresses an issue, federal law is not clearly established, and federal habeas relief is unavailable

2  because the federal habeas court must defer to the state court's decision.  See Musladin, 549 U.S.

3  at 76-77; Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (citing Wright v. Van Patten, 552

4  U.S. 120 (2008)).  Circuit precedent may not be "used to refine or sharpen a general principle of

5  Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not

6  announced."  Marshall v. Rodgers, 133 S. Ct. 1446, 1450 (2013) (citing Parker v. Matthews, 132

7  S. Ct. 2148, 2155 (2012) (per curiam)).

8          A state court decision is "contrary to" clearly established federal law if it applies a

9  rule contradicting a holding of the Supreme Court or reaches a result different from Supreme

10  Court precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640

11  (2003).  Under the "unreasonable application" clause of § 2254(d)(1), "a federal habeas court

12  may grant the writ if the state court identifies the correct governing legal principle from [the

13  Supreme Court's] decisions, but unreasonably applies that principle to the facts of the prisoner's

14  case."[3]  Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413); see

15  also Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004).  In this regard, "a federal habeas court

16  may not issue the writ simply because that court concludes in its independent judgment that the

17  relevant state-court decision applied clearly established federal law erroneously or incorrectly.

18  Rather, that application must also be unreasonable."  Williams, 529 U.S. at 411; see also Schriro

19  v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 ("It is not enough that a federal

20  habeas court, in its 'independent review of the legal question,' is left with a '"firm conviction"'

21  that the state court was '"erroneous"'").  "A state court's determination that a claim lacks merit

22  precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of

23  the state court's decision."  Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough

24  v. Alvarado, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas

25  corpus from a federal court, a state prisoner must show that the state court's ruling on the claim

26  _____

27          [3]       Under § 2254(d)(2), a state court decision based on a factual determination is not
    to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
    presented in the state court proceeding."  Stanley, 633 F.3d at 859 (quoting Davis v. Woodford,

28  384 F.3d 628, 638 (9th Cir. 2004)).

1   being presented in federal court was so lacking in justification that there was an error well

2   understood and comprehended in existing law beyond any possibility for fair-minded

3   disagreement." Id. at 103.

4           If the state court's decision does not meet the criteria set forth in § 2254(d), a

5   reviewing court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v.

6   Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th

7   Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of

8   § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

9   considering de novo the constitutional issues raised.").

10          The court looks to the last reasoned state court decision as the basis for the state

11  court judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.

12  2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning

13  from a previous state court decision, this court may consider both decisions to ascertain the

14  reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en

15  banc). "When a federal claim has been presented to a state court and the state court has denied

16  relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

17  of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99.

18  This presumption may be overcome by a showing "there is reason to think some other

19  explanation for the state court's decision is more likely." Id. at 99-100.

20

21                                    **III. DISCUSSION**

22          Petitioner asserts the following claims in his federal habeas petition: (1) the trial

23  court erred when it denied the mistrial motion; and (2) the trial court erred in admitting certain

24  evidence during the direct examination of Petitioner's common law wife Shannon Parks. See

25  ECF No. 13. Respondent contends Petitioner is not entitled to federal habeas relief because the

26  state court's determinations on these claims were neither contrary to nor based on an

27  unreasonable application of clearly established federal law. See ECF No. 20.

28  / / /

**A.**     **Claim 1: Trial Court Erred in Denying the Mistrial Motion**

Petitioner argues that the trial court erred when it denied his mistrial motion based on witness misconduct and prosecutorial misconduct after the prosecution's witness Michelle Fields testified that Petitioner was usually "in and out of prison."  ECF No. 13 at 2-3, 10-11; see also ECF No. 22 at 28-38.  Respondent contends that the state court's rejection of the claim was reasonable.  ECF No. 20-1 at 9-17.  This Court agrees.

The state appellate court considered and rejected Petitioner's claim on the merits as stated below:

### 1.     Additional Background

The court ruled in limine that evidence of Sloan's criminal history was not admissible unless he chose to testify. Shortly after the beginning of Michelle Shields's direct testimony, the prosecutor asked her how often she encountered Sloan in 2012. The following exchange occurred:

"[The Prosecutor]: Q. Okay. The defendant, how often did you see him back in 2012?

"A. More than usual.

"Q. Like every—every day? Once a week? Once a month? About how often would you see him?

"A. That's hard for me to—I don't understand what you're trying to say. Because he was usually in and out of prison, so I didn't—

"[Defense counsel]: Objection.

"THE WITNESS: Oops.

"[Defense counsel]: May I approach, please?

"THE COURT: You don't need to approach. But ladies and gentlemen, you're to disregard the last statement of the witness. And then we can make a further record later if you like, Mr. Riggs [defense counsel].

"[The Prosecutor]: Q. All right. So when you'd see him would you see him—

"THE COURT: But let me stop. Ms. Shields, don't volunteer information like that. Okay? Answer the questions that are asked of you. Go ahead Ms. Abrams [the prosecutor]."

Defense counsel later moved for a mistrial based on Shields's statement about Sloan's having been "in and out of prison." Defense counsel contended in part that Shields's comment was prejudicial because it suggested Sloan had served multiple prison terms. The prosecutor

argued the comment was inadvertent and had been cured by the court's immediate admonition.

The court denied the mistrial motion. The court noted Shields had made a "general" statement, rather than a statement about a specific crime or type of crime. The court also noted the defense could challenge Shields's credibility on cross-examination, which could weaken the credibility of all her testimony, including the statement she had "blurted out" about Sloan's having been in prison. The court concluded it had cured any prejudice by immediately admonishing the jury to disregard the statement.

The court later admonished the jury again on this issue (without mentioning Shields's statement specifically). The court stated: "I had previously admonished you to disregard certain testimony. I may do that in the future during this trial. Or I may strike testimony in the future that you hear me order stricken. If I strike testimony or if I admonish you to disregard testimony, you are not to consider that type of testimony or such testimony for any purpose whatsoever. Does everybody understand that?"

### 2.   Analysis

Sloan contends the court erred by denying the motion for a mistrial. " 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' [Citation.] Although most cases involve prosecutorial or juror misconduct as the basis for the motion, a witness's volunteered statement can also provide the basis for a finding of incurable prejudice." (*People v. Wharton* (1991) 53 Cal.3d 522, 565.)

The court did not abuse its discretion by denying Sloan's motion for a mistrial. As the court noted, Shields made a general statement that Sloan had been in and out of prison. She did not state he had committed prior violent crimes. The court reasonably concluded Shields's brief statement was curable by an instruction to the jury. (See, e.g., *People v. Ledesma* (2006) 39 Cal.4th 641, 683 [witness's comment that defendant had been on death row was not incurably prejudicial]; *People v. Valdez* (2004) 32 Cal.4th 73, 124-125 [witness's reference to defendant's incarceration was not incurable].)

Sloan argues the phrasing used by Shields (i.e., that Sloan was "usually in and out of prison") suggested he had served multiple prison terms and thus was more prejudicial than a witness's reference to a single term of incarceration. The court expressly considered the language used by Shields and concluded it did not establish incurable prejudice. The court stated that Shields's use of the word " 'usually' " "perhaps added to the potential to cause prejudice," but the court also stated that Shields's use of the word " 'out' " (of prison) *reduced* the risk that a juror might think Sloan had served a single, lengthy prison term for a crime similar to the one charged in the present case. The court's analysis of Shields's brief statement, and its conclusion that a prompt admonition to the jury was sufficient to cure any prejudice from the statement, were reasonable.

Sloan argues briefly that the prosecutor committed misconduct by seeking to elicit the statement from Shields or by inadequately preparing her to testify. (See *People v. Smithey* (1999) 20 Cal.4th 936, 960 [a prosecutor commits misconduct if he or she intentionally elicits inadmissible testimony].) There is no basis for reversal. Shields made the

statement in response to a question by the prosecutor about how often she saw Sloan in 2012; the prosecutor did not ask for information about Sloan's prior incarcerations. Shields immediately said "Oops," which suggests she knew, but forgot, that she was not supposed to mention Sloan had been in prison. We find no evidence that would undercut the trial court's conclusion that Shields just "blurted out" the statement.

The cases principally relied on by Sloan—*People v. Navarrete* (2010) 181 Cal.App.4th 828 (*Navarrete* ) and *People v. Thomas* (1975) 47 Cal.App.3d 178—are distinguishable. In *Navarrete*, a police detective deliberately flouted a trial court order by testifying the defendant had made a "statement," and the appellate court concluded that the jury, under the circumstances, likely inferred that term referred to a confession. (*Navarrete, supra,* 181 Cal.App.4th at pp. 829, 831-832, 834, 836.) In light of the uniquely prejudicial impact on jurors of a belief that a defendant has confessed to the charged crime, the appellate court concluded that the curative instruction given by the trial court there was insufficient and that a mistrial should have been declared. (*Id.* at pp. 834-835.) In reaching that conclusion under the facts presented, the *Navarrete* court noted that, "[o]rdinarily, a curative instruction to disregard improper testimony is sufficient to protect a defendant from the injury of such testimony, and, ordinarily, we presume a jury is capable of following such an instruction."[2] (*Navarrete, supra,* 181 Cal.App.4th at p. 834.) For the reasons discussed, we conclude the court's prompt curative instruction here was sufficient to protect Sloan from any injury flowing from Shields's brief statement; in contrast to *Navarrete*, there was no " 'exceptional circumstance' " here that required granting a mistrial. (*Id.* at p. 836.)

[N.2 As Sloan notes, the appellate court in *Navarrete* stated the willfulness of the detective's misconduct was not the reason it reversed the judgment. (*Navarrete, supra,* 181 Cal.App.4th at p. 836.) The court did, however, consider the detective's willfulness to be relevant to its analysis of the likely prejudicial impact of his statement. (*Id.* at pp. 836-837 ["We do not reverse because [the detective's] misconduct was willful, but his willfulness reveals the effect he hoped his misconduct would have on the jury. He intended to tell the jury about appellant's statement because he intended to prejudice the jury against appellant. On one point we agree with the detective: His misconduct more likely than not achieved the effect he sought." (Italics omitted.) ].)]

*Thomas* is further afield. In that case, we held the trial court should have granted a mistrial where several jurors had been exposed to pretrial publicity about the case. (*People v. Thomas, supra,* 47 Cal.App.3d at pp. 180-182.) We do not read *Thomas* as departing from the rule applicable in the different situation here, i.e., that a witness's volunteered statement generally can be cured with an appropriate instruction. (See *Navarrete, supra,* 181 Cal.App.4th at p. 834.)

ECF No. 22-1, pgs. 7-11.

/ / /

/ / /

/ / /

1    To the extent Petitioner claims that the trial court erred in denying defense

2    counsel's motion for a mistrial by misapplying state law, this argument does not warrant

3    federal habeas relief.  Under California law, a trial court has broad discretion to grant a mistrial.

4    See People v. Williams, 40 Cal. 4th 287, 323 (2007).  A federal habeas court is bound to the

5    state court's interpretation of state law.  See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (per

6    curiam) ("We have repeatedly held that a state court's interpretation of state law, including one

7    announced on direct appeal of the challenging conviction, binds a federal court sitting in habeas

8    corpus."); Estelle, 502 U.S. at 67-68; see also Waddington v. Sarausad, 555 U.S. 179, 192 n. 5

9    (2009).

10    Petitioner argues that his mistrial motion for prosecutorial misconduct and

11    witness misconduct was improperly denied.  This Court addresses each argument in turn below.

12    In reviewing a prosecutorial misconduct claim, habeas courts ask whether the

13    prosecutor's misconduct "'so infected the trial with unfairness as to make the resulting conviction

14    a denial of due process.'"  Darden v. Wainwright, 477 U.S. 168, 181 (1986) (Donnelly v.

15    DeChristoforo, 416 U.S. 637, 643 (1974)); see also Parker v. Matthews, 567 U.S. 37, 45 (2012)

16    (per curiam); Greer v. Miller, 483 U.S. 756, 765-66 (1987).  "[T]he Darden standard is a very

17    general one," and courts, therefore, have "'more leeway . . . in reaching outcomes in case-by-case

18    determinations.'"  Parker, 567 U.S. at 48 (quoting Alvarado, 541 U.S. at 664).  Even if there was

19    prosecutorial misconduct, habeas relief is only warranted if petitioner can establish that the error

20    "'had substantial and injurious effect or influence in determining the jury's verdict.'"  Brecht v.

21    Abrahamson, 507 U.S. 619, 637 (1993) (citation omitted); see also Parle v. Runnels, 387 F.3d

22    1030, 1044 (9th Cir. 2004).

23    After reviewing the record, this Court concludes that the state court's rejection of

24    Petitioner's argument was objectively reasonable.  The trial court granted a motion in limine to

25    exclude references to Petitioner's other offenses in the State's case-in-chief.  ECF No. 20-5 at

26    302-03.  During direct examination, the prosecutor asked a witness how often she saw Petitioner

27    back in 2012, and the witness answered "[m]ore than usual."  Id. at 501.  The prosecutor

28    attempted to clarify her response, and the witness stated "[t]hat's hard for me to – I don't

1  understand what you're trying to say. Because he was usually in and out of prison…." Id.

2  Defense counsel objected to the witness's answer. Id.  The trial court instructed the jury to

3  "disregard the last statement of the witness," and asked the witness to avoid volunteering

4  information like that. Id.  Defense counsel moved for a mistrial.  The trial court heard argument

5  on the motion and denied the motion, concluding that it was only a generalized statement, and

6  the error was curable with the court's instruction. Id. at 602-06.  The trial court later instructed

7  "[i]f I ordered testimony stricken from the record or ordered you to disregard certain testimony

8  or statements you must disregard those things and must not consider them for any purpose."

9  ECF No. 20-3 at 4-2.  Based on the sequence of events—one generalized statement, an

10  immediate objection, and two curative instructions—it was not objectively unreasonable for the

11  state court to conclude that the alleged prosecutorial misconduct did not violate petitioner's due

12  process rights and to affirm the trial court's denial of the mistrial motion. See Greer, 483 U.S. at

13  766; Purtle v. Knowles, 105 F. App'x 169, 170 (9th Cir. 2004) ("Even if the prosecutor's

14  question amounted to misconduct, it did not affect the fundamental fairness of the trial because

15  the trial court immediately struck the response, instructed the jury to disregard the stricken

16  testimony, and the prosecutor did not refer to the stricken testimony in his closing argument to

17  the jury.")

18          In reviewing Petitioner's claim based on witness misconduct, this Court also

19  concludes that the witness's statement that Petitioner was "in and out of prison" did not render his

20  trial fundamentally unfair as to deprive him of due process.  As explained above, the witness

21  made one passing comment on this issue, and the trial court immediately admonished the jury to

22  disregard the statement.  Before closing arguments, the trial court again instructed the jury to

23  disregard the statement.  ECF No. 20-3 at 4-2.  There is presumption that the jury follows the

24  court's instructions, and Petitioner has not presented any evidence to rebut this presumption here.

25  See Weeks v. Angelone, 528 U.S. 225, 234 (2000).

26  / / /

27  / / /

28  / / /

13

1     To the extent Petitioner argues that his counsel was ineffective for failing moving

2  for a mistrial, this claim fails.  ECF No. 13 at 10.  Because an application for writ of habeas

3  corpus can be denied on the merits even when Petitioner has failed to exhaust state remedies, 28

4  U.S.C. § 2254(b)(2), this Court considers the merits of his argument.  To state an ineffective

5  assistance of counsel claim, a defendant must show that his counsel's performance was deficient

6  and prejudiced him.  <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984).  For the deficiency

7  prong, "a court must indulge a strong presumption that counsel's conduct falls within the wide

8  range of reasonable professional assistance; that is, the defendant must overcome the presumption

9  that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"

10  <u>Id.</u> at 689 (citation omitted).  For the prejudice prong, the defendant "must show that there is a

11  reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

12  would have been different.  A reasonable probability is a probability sufficient to undermine

13  confidence in the outcome."  <u>Id.</u> at 694.  When § 2254(d) applies, the "question is whether there

14  is any reasonable argument that counsel satisfied *Strickland's* deferential standard."  <u>Richter</u>, 562

15  U.S. at 105.

16     Here, Petitioner has not met this challenging standard.  His counsel immediately

17  objected to the challenged testimony and later filed a mistrial motion, which the court denied.

18  There is no evidence that defense counsel opposed his client's wishes in open court, as Petitioner

19  claims.  Such unsupported statements are insufficient to support habeas relief.  <u>See</u> <u>Greenway v.</u>

20  <u>Schriro</u>, 653 F.3d 790, 804 (9th Cir. 2011).

21     The state court's decision was not contrary to, or an unreasonable application of,

22  clearly established Supreme Court authority.  This Court recommends denying habeas relief on

23  claim one.

24     **B.**     **<u>Claim 2: Evidence During the Direct Examination of Parks</u>**

25     Petitioner claims that certain portions of Shannon Parks's testimony were

26  improperly admitted, and that the prosecutor committed prosecutorial misconduct by eliciting this

27  testimony.  ECF No. 13 at 5-7; <u>see also</u> ECF No. 22.  Respondent claims that the state court

28  reasonably rejected Petitioner's claim.  ECF No. 20 at 17-24.

14

The state appellate court considered and denied Petitioner's argument:

> Shannon Parks, called as a witness by the prosecution, testified she had been in a relationship with Sloan on and off for 14 years. They had six children together, and she considered him her "common-law husband." On March 29, 2012, Parks and some of her children were staying in a battered women's shelter in Sacramento. Parks testified at trial that she did not enter the battered women's shelter because Sloan was abusive; instead, she did so because she was homeless and had nowhere else to live. When she was interviewed by police after Sloan's arrest, Parks stated she was staying in the battered women's shelter because she had been arguing with Sloan.

> In early April 2012, Parks and her children left the shelter and moved with Sloan to a motel in Sacramento for a few days, and then around April 5, they traveled by bus with him to Fortuna, in Humboldt County. While in Sacramento; Parks gave Sloan money to buy a cell phone, she bought luggage, she paid for the motel and the bus ride to Fortuna. Once in Fortuna, they stayed in a motel under the name of a friend of Parks. Parks testified she would not do "anything" for Sloan, but she would do "a lot" for him and had lied for him in the past, although she did not know whether she had lied for him to authorities. Police arrested Sloan in a motel parking lot in Fortuna on April 11, 2012.

> At trial, Parks denied having told the police (when she was interviewed after Sloan's arrest) that Sloan was in Fortuna to hide from law enforcement. A police officer testified that Parks had told him Sloan was hiding from the police in Fortuna.

> Sloan argues certain portions of Parks's testimony were improperly admitted. We find no error.

### 1.    Parks's Statement About Sloan's Being in Jail

> During a colloquy between the court and counsel prior to Parks's trial testimony, the prosecutor requested that the court "admonish her not to talk about prison or parole so that she is on notice by the Court." Defense counsel commented that the witness "should have already been admonished about that," and the prosecutor explained, "Right. I'm just asking that the Court do it so we are protected." The court agreed, and after Parks entered the courtroom (without the jury present), the court admonished her that "there should be no answers of you that volunteer information about the defendant's past prison or county jail commitments or record." Parks then began her testimony.

> Parks's direct testimony continued on the following court day. Near the end of her direct testimony, the following exchange occurred:

> "[The Prosecutor]: Q. Okay. Have you, in this whole time—you said that, you know, he's your common-law husband. You stayed in contact with him until—since he was arrested in April of 2012, right? You said you talked to him every day?

> "A. Yes.

> "Q. Right? Have you ever asked him where his whereabouts were the night of the murder?

> "A. No.

15

1

"Q. Why?

2

"A. Um, he's been in jail.

3

"Q. Why haven't you asked him?

4

"[Defense Counsel]: Objection.

5

"THE WITNESS: He's not allowed to—

6

"[Defense Counsel]: Objection. Objection on the comment where he's been. Can I approach?

7

"THE COURT: Well, I get the objection, but it really wasn't prompted by the question. So I will overrule the objection. But, ladies and gentlemen, I will ask you to disregard any reference to the defendant being in jail. It's not relevant to your consideration of the facts in this proceeding, so please disregard it."

8

9

10

We reject Sloan's argument that the prosecutor committed misconduct (a claim he did not raise at trial). The prosecutor did not ask about Sloan's incarceration, and we see no impropriety in the prosecutor's general question as to why Parks did not ask Sloan about his whereabouts on the night of the murder. The trial court correctly found Parks's response (volunteering information about Sloan's having been in jail, despite the court's earlier admonishment) was not called for by the prosecutor's question.

11

12

13

14

To the extent Sloan contends Parks herself engaged in prejudicial misconduct, we note he did not move for a mistrial. In any event, declining to grant a mistrial was not an abuse of discretion. The court admonished the jury not to consider Parks's statement; she did not elaborate; and the prosecutor moved on with her questioning. We also note that, in light of the preceding questions from the prosecutor about whether Parks had communicated with Sloan *since his arrest for the charged crime*, Parks's answer appears to convey only that Sloan had been in jail after that arrest (inferably *for* the charged offense); Parks did not state Sloan had a prior history of committing crimes or being in prison. The trial court reasonably could conclude there was no incurable prejudice from Parks's statement. (See *People v. Wharton, supra,* 53 Cal.3d at p. 565 [standard for granting mistrial].)

15

16

17

18

19

20

21

## 2.     Evidence that Parks Engaged in Prostitution

22

Prior to Parks's testimony, the court stated it was not inclined to admit evidence that Parks had engaged in prostitution. Later, during Parks's testimony, the prosecutor stated at a sidebar conference that she wanted to impeach Parks with a Las Vegas conviction for prostitution. Defense counsel argued evidence of prostitution was irrelevant and would be a waste of time and result in a "mini-trial." (See Evid. Code, § 352.) The court ruled the proposed questioning was proper impeachment and would not waste time or result in a mini-trial. Defense counsel asked whether the questioning would link Sloan to Parks's prostitution. The prosecutor responded that Parks said Sloan was not her pimp and that there would be no questions about that.

23

24

25

26

27

28

16

After her testimony resumed, Parks acknowledged, in response to a question from the prosecutor, that she had engaged in prostitution in Las Vegas. The prosecutor did not ask Parks about Sloan's having had any connection with her prostitution.

On appeal, Sloan contends the court improperly allowed the prosecutor to ask Parks about her past prostitution. We disagree.

A witness may be impeached by evidence of conduct involving moral turpitude. (*People v. Wheeler* (1992) 4 Cal.4th 284, 295-297 & fn. 7.) Prostitution is a crime of moral turpitude. (*People v. Chandler* (1997) 56 Cal.App.4th 703, 709.) A trial court's decision whether to admit evidence of past misconduct involving moral turpitude to impeach a witness, including its decision whether to exclude or limit such evidence under Evidence Code section 352, is reviewed for abuse of discretion. (*People v. Ardoin* (2011) 196 Cal.App.4th 102, 121.)

Sloan argues the impeachment here was improper because prostitution is legal in parts of Nevada. But the prosecutor represented Parks had a conviction for prostitution, and Sloan did not contend otherwise. The court was not obligated to conclude Parks's conduct was legal.

Sloan's contention that the court should not have allowed the impeachment because Parks was a prosecution witness or because the questions about prostitution pertained to a "collateral matter" is meritless. The credibility of a witness may be attacked by any party, including the party that called the witness. (Evid. Code, § 785.) And although Evidence Code section 352 empowers courts to limit impeachment to prevent mini-trials on collateral issues (*People v. Wheeler, supra,* 4 Cal.4th at p. 296), the prosecutor's questioning about prostitution consisted of just a few questions, amounting to less than a page of the reporter's transcript of the trial. The court did not abuse its discretion in allowing this limited questioning.

Finally, Sloan asserts the prosecutor improperly used the evidence of Parks's prostitution to attack Sloan's character. We are not persuaded. The prosecutor's questioning of Parks about the length of time she had known Sloan (a portion of testimony cited by Sloan in support of this argument) occurred in connection with Parks's claim that she did not know who Sloan's friends were. There was no improper attempt to suggest Sloan was involved in Parks's prostitution.

### 3.   Evidence of Domestic Violence

After Parks testified she had lied for Sloan in the past but did not know whether she had lied for him to authorities, the prosecutor asked at a sidebar conference for permission to ask Parks (1) whether she had lied to authorities about an assault Sloan committed against her in Texas, (2) why she was in a battered women's shelter in Sacramento in March 2012, and (3) whether she had obtained a restraining order against Sloan in 2011. The court stated, "I think those are all permissible, all appropriate, so long as we don't get into specific details. Because she is describing basically herself as being in his camp. I think this is proper grounds for examination based on what she has now said." The court ultimately ruled, "At this point I find the probative value of these questions outweighs any undue prejudice, and any prejudicial value can be cured by an admonition, if requested, or does not substantially outweigh the probative value."

/ / /

17

Parks testified she did not recall lying to the police about Sloan's assaulting her in Texas, and she had no recollection that he injured her there in 2007. She did not recall her statements to the police, but she asserted she tried to hit Sloan with an iron, and he got arrested. At some point, she obtained a restraining order against him because of physical abuse. She did not enter a battered women's shelter because he abused her but rather because she was homeless and had nowhere to live.

The court did not abuse its discretion in allowing this questioning. Evidence of the nature of Parks's relationship with Sloan and her fear of him was relevant to show her bias and her willingness to lie to protect him. (See *People v. Friend* (2009) 47 Cal.4th 1, 87.) Sloan argues the prosecution should not have been allowed to impeach Parks because her testimony about Sloan's traveling to Fortuna was helpful to the prosecution. But Parks also sought to deny or minimize improper or suspicious conduct by Sloan, such as by denying his actions were responsible for her entry into the battered women's shelter and denying the trip to Fortuna was a flight from the police. The trial court did not abuse its discretion in permitting the prosecution to explore her bias.

### 4.    Parks's Tattoo

In response to questioning by the prosecutor, Parks testified she previously had a tattoo stating, " 'Big Daddy Sloan's bitch,' " which had been removed. Sloan's nickname is " 'Big Daddy.' " Parks testified she got the tattoo because she was "drunk in Vegas."

Prior to this portion of Parks's testimony, the court ruled the prosecutor could ask about the tattoo because it was probative of Parks's bias and her association with Sloan and was not unduly prejudicial. Sloan's conclusory argument to the contrary does not persuade us the court's decision was unreasonable.

ECF No. 21-1, pgs. 11-16.

Petitioner argues that the prosecutor improperly elicited testimony from Parks on four issues: that Petitioner was in jail; Parks worked a prostitute in Las Vegas; Parks and Sloan's relationship included prior incidents of domestic violence; and Parks had a tattoo stating, "Big Daddy Sloan's bitch." ECF No. 13 at 5-6. This Court addresses each issue below.

First, Petitioner claims that the prosecutor committed misconduct by eliciting testimony from Parks that she did not ask Sloan where he was the night of the murder because he was in jail. This Court rejects that argument. As the state appellate court determined, the prosecutor did not ask about Sloan's incarceration, but merely asked a general question as to why she did not ask Sloan about his location on the night in question. In response, Parks volunteered the information that Sloan was in jail. ECF No. 20-6 at 724. The prosecutor's question by itself did not solicit such information. Even if there was an error, it did not infect the trial with such

18

1  unfairness as to render his conviction a denial of due process.  Darden, 477 U.S. at 181.

2  Immediately after Parks's statement, defense counsel objected to "the comment where he's been."

3  ECF No. 20-6 at 724.  The trial court admonished the jury on this issue.  Id. ("Well, I get the

4  objection, but it really wasn't prompted by the question. So I will overrule the objection. But,

5  ladies and gentlemen, I will ask you to disregard any reference to the defendant being in jail. It's

6  not relevant to your consideration of the facts in this proceeding, so please disregard it.")  As

7  stated above, a jury is presumed to follow the court's instructions, and Petitioner has not provided

8  any reason for this Court to reject that presumption here.  Weeks, 528 U.S. at 234.

9         Next, Petitioner claims that the trial court permitted improper testimony that Parks

10  worked as a prostitute, experienced prior domestic violence with Petitioner, and a had tattoo with

11  his name.  ECF No. 13 at 5-6.  Whether evidence is irrelevant is a matter of state law and is not

12  cognizable on habeas review.  See Estelle, 502 U.S. at 67-68; Holley v. Yarborough, 568 F.3d

13  1091, 1101 (9th Cir. 2009).  Errors of state law do not warrant federal habeas relief.  See Estelle,

14  502 U.S. at 67-68; Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995).  The erroneous

15  admission of evidence is grounds for federal habeas corpus relief only if it made the state

16  proceedings so fundamentally unfair as to violate due process.  See Jammal v. Van de Kamp, 926

17  F.2d 918, 919-20 (9th Cir. 1991).

18         Assuming the claim is cognizable, "[u]nder AEDPA, even clearly erroneous

19  admissions of evidence that render a trial fundamentally unfair may not permit the grant of

20  federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by

21  the Supreme Court."  Holley, 568 F.3d at 1101; see also Walden v. Shinn, 990 F.3d 1183, 1204

22  (9th Cir. 2021).  Because the Supreme Court has not clearly decided whether the admission of

23  irrelevant or unduly prejudicial evidence constitutes a due process violation sufficient to warrant

24  habeas relief, Holley, 568 F.3d at 1101, this Court cannot conclude that the state court's ruling

25  was contrary to, or an unreasonable application of, clearly established federal law.  See generally,

26  Wright v. Van Patten, 552 U.S. 120, 126 (2008) (per curiam); Bradford v. Paramo, No. 2:17-cv-

27  05756 JAK JC, 2020 WL 7633915, at *6-7 (C.D. Cal. Nov. 12, 2020) (citing cases).

28  / / /

Lastly, Petitioner's argument cannot succeed on the merits.  Admission of evidence violates due process only if the jury could draw no permissible inferences from the evidence.  Jammal, 926 F.2d at 920 ("Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.'") (citation omitted))  That did not occur here.  For the prostitution evidence, this evidence was admissible to impeach the witness's credibility.  ECF No. 20-6 at 682-83; Cal. Evid. Code § 785 ("The credibility of a witness may be attached or supported by any party, including the party calling him.").  As to the domestic violence evidence, this evidence was relevant to show the witness has lied in the past for Petitioner.  ECF No. 20-6 at 691-700.  Third, as to the "Big Daddy Sloan's bitch" tattoo, this evidence was relevant to show her bias towards Petitioner.  Id. at 700-01.  The fact that she got the tattoo when she was drunk and had it removed does not make it unduly prejudicial.  Based on this Court's review of the record, none of the challenged evidence rendered the trial fundamentally unfair as to warrant habeas relief.

To the extent Petitioner claims that defense counsel was ineffective because he failed to object to these issues on other grounds, this claim also fails.  ECF No. 13 at 6.  Defense counsel objected to the evidence Petitioner now challenges.  The vague, unsupported claim that defense counsel could have done more does not warrant habeas relief.  See Greenway, 653 F.3d at 804; James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific fact do not warrant habeas relief.")

Lastly, Petitioner claims that these errors cumulatively deprived him of a fair trial.  ECF No. 13 at 5.  The Ninth Circuit has concluded that under clearly established United States Supreme Court precedent the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal.  Parle v. Runnels, 505 F.3d 922, 927 (9th. Cir. 2007) (citing Donnelly, 416 U.S. at 643, and Chambers v. Mississippi, 410 U.S. 284, 290 (1973)).  "[T]he fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense 'far less persuasive,' and thereby had a 'substantial and injurious effect or influence' on the jury's

1 | verdict." <u>Parle</u>, 505 F.3d at 928 (internal citations omitted); <u>see also</u> <u>Hein v. Sullivan</u>, 601 F.3d

2 | 897, 916 (9th Cir. 2010) (same).

3 |    This Court has addressed each of Petitioner's claims and has concluded that no

4 | error of constitutional magnitude occurred.  This Court also concludes that the alleged errors,

5 | even when considered together, did not render Petitioner's defense "far less persuasive," nor did

6 | they have a "substantial and injurious effect or influence on the jury's verdict."  Accordingly,

7 | Petitioner is not entitled to relief on his claim of cumulative error.

8 |

9 | **IV.  CONCLUSION**

10 |    Based on the foregoing, the undersigned recommends that Petitioner's amended

11 | petition for a writ of habeas corpus, ECF No. 13, be denied.

12 |    These findings and recommendations are submitted to the United States District

13 | Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days

14 | after being served with these findings and recommendations, any party may file written

15 | objections with the court.  Responses to objections shall be filed within 14 days after service of

16 | objections.  Failure to file objections within the specified time may waive the right to appeal.  <u>See</u>

17 | <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

18 |

19 | Dated:  October 18, 2022

20 |

DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE

21